D. Maimon Kirschenbaum
Michael DiGiulio
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 688-2548 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
**UWAIS SYED,**

                **Plaintiff,**

      **v.**

**S&P PHARMACY CORP., SHAZIA**
**PHARMACY INC., NATHAN'S**
**PHARMACY, SAUL'S PHARMACY AND**
**SURGICAL SUPPLIES, APNI PHARMACY**
**CORP., WATTO CORPORATION,**
**MEDICINE SHOPPE PHARMACY,**
**PERVEZ SIDDIQUI, SHAZIA BIBI, and**
**SHAHBAZ WATTO,**

              **Defendants.**
-------------------------------------------------------x

**FIRST AMENDED COMPLAINT**
**and JURY TRIALDEMAND**


**CASE NO.: 1:21-CV-6000 (AMD)(PK)**

Plaintiff Uwais Syed alleges as follows:

## JURISDICTION AND VENUE

1.  This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*., and the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"). This Court has supplemental jurisdiction over the New York state law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.      Venue is proper in this District because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

3.      All Defendants are hereinafter collectively referred to as "Defendants."

4.      Defendant Pervez Siddiqui, Defendant Shazia Bibi, and Defendant Shahbaz Watto are collectively referred to as "Individual Defendants."

5.      Defendant Marhaba Pharmacy, Shazia Pharmacy, Nathan's Pharmacy, and Saul's Pharmacy, Apni Pharmacy, Healthy Ways Pharmacy, and Medicine Shoppe Pharmacy are collectively referred to as "Corporate Defendants."

6.      Defendant S&P Pharmacy Corp. d/b/a Marhaba Pharmacy ("Marhaba" or "Pharmacy") is a New York corporation that operates a retail pharmacy business known as Marhaba Pharmacy located at 2029 Bath Avenue, Brooklyn, NY 11214.

7.      Defendant Shazia Pharmacy Inc., d/b/a Shazia Pharmacy ("Shazia Pharmacy") is a New York corporation that operates a retail pharmacy business known as Shazia Pharmacy located at 3166 Coney Island Ave, Brooklyn, NY 11235.

8.      Defendant Nathan's Pharmacy ("Nathan's Pharmacy") is a New York corporation that operates a retail pharmacy business known as Nathan's Pharmacy located at 1901 Bath Avenue, Brooklyn, NY 11214.

9.      Defendant Saul's Pharmacy and Surgical Supplies ("Saul's Pharmacy") is a New York corporation that operates a retail pharmacy business known as Saul's Pharmacy and Surgical located at 3514 Mermaid Ave, Brooklyn, NY 11224.

10.     Defendant Apni Pharmacy Corp. ("Apni Pharmacy") is a New York corporation that operates a retail pharmacy business known as Apni Pharmacy located at 211 Neptune Ave, Brooklyn, NY 11235.

11.     Defendant Watto Corporation d/b/a Healthy Ways Pharmacy ("Healthy Ways Pharmacy") is a New York corporation that operates a retail pharmacy business known as Healthy Ways Pharmacy located at 3074 Coney Island Ave, Brooklyn, NY 11235.

12.     Defendant Medicine Shoppe Pharmacy ("Medicine Shoppe Pharmacy") is a New York corporation that operates a retail pharmacy business known as Medicine Shoppe Pharmacy located at 1109 Coney Island Ave, Brooklyn, NY 11235.

13.     Each Corporate Defendant has an annual gross volume of sales in excess of $500,000.

14.     Defendant Pervez Siddiqui ("Siddiqui") is Marhaba's owner and CEO. Defendant Siddiqui also owns a number of other pharmacies in Brooklyn, New York with the other Individual Defendants including, but not limited to, Shazia Pharmacy, Nathan's Pharmacy, and Saul's Pharmacy, Apni Pharmacy, Healthy Ways Pharmacy, and Medicine Shoppe Pharmacy.

15.     Defendant Shazia Bibi ("Bibi") is an owner of Marhaba. Defendant Bibi also owns a number of other pharmacies in Brooklyn, New York with the other Individual Defendants, including, but not limited to, Shazia Pharmacy, Nathan's Pharmacy, and Saul's Pharmacy, Apni Pharmacy, Healthy Ways Pharmacy, and Medicine Shoppe Pharmacy.

16.     Defendant Shahbaz Watto ("Watto") is the store manager for Marhaba Pharmacy. Defendant Watto also owns a number of other pharmacies in Brooklyn, New York with the other Individual Defendants, including, but not limited to, Shazia Pharmacy, Nathan's Pharmacy, and

Saul's Pharmacy, Apni Pharmacy, Healthy Ways Pharmacy, and Medicine Shoppe Pharmacy. Defendant Watto was Mr. Syed's direct supervisor at the Marhaba Pharmacy.

17.     Plaintiff Uwais Syed ("Plaintiff" or "Syed) was employed by Defendants as the Supervising Pharmacist at Marhaba Pharmacy from August 2018 to June 26, 2021.

## FACTS

18.     Defendants committed the acts alleged in this Complaint knowingly, intentionally, and willfully.

19.     Plaintiff has been a registered and practicing pharmacist since 1996.

20.     Plaintiff is an accomplished pharmacist. He has worked for many pharmacies during his career and was recognized as a competent, thorough, and honest employee.

21.     Plaintiff began working for Defendants as the Supervising Pharmacist at Marhaba Pharmacy in August 2018.

22.     As the Supervising Pharmacist, Plaintiff was entrusted to run the Marhaba Pharmacy, verify prescriptions, fill orders, and ensure compliance with state and federal regulations.

## Integrated Enterprise/Joint Employer Facts

23.     The Individual Defendants own all of the Corporate Defendants and operate them as one integrated enterprise that shares resources, employees, and supplies.

24.     Defendant Siddiqui and Defendant Bibi are the principal owners and operators of, and decisionmakers for, the various Corporate Defendants. The Individual Defendants ran the business operations for the Corporate Defendants (along with other businesses owned by the Individual Defendants, including adult day-care facilities) out of an office located at 236 Neptune Ave, Brooklyn NY 11235.

25.     The Individual Defendants used this office space to run the back office

operations of all the Corporate Defendants, including but not limited to tasks related to payroll, finances, human resources, and inventory management.

26.     The Corporate Defendants and Individual Defendants shared employees and routinely scheduled employees who worked mainly in one pharmacy to shifts in other pharmacies both on a regular basis and to cover for unexpected absents.

27.     For instance, the Supervising Pharmacist at Healthy Ways, Kutab Rangwla, regularly worked each Thursday at the Marhaba Pharmacy.

28.     The Supervising Pharmacist at Nathan's Pharmacy, Ms. Rola, would cover for Plaintiff at the Marhaba Pharmacy on Plaintiff's days off or if Plaintiff was unable to travel to work because of inclement weather.

29.     An individual named Tayymur worked as a pharmacist at Medicine Shoppe Pharmacy, Shazia Pharmacy, and other of the Corporate Defendants' pharmacies. Tayymur also worked a regular shift every Sunday at the Marhaba Pharmacy.

30.     The Supervising Pharmacist at Shazia Pharmacy, Ms. Samina Dodwala, covered many of Plaintiff's shifts at the Marhaba Pharmacy in the winter of 2020 when Plaintiff was required to stay home as a result of a potential covid-19 outbreak.

31.     Defendant Siddiqui and Defendant Bibi often directed the technicians who work for the Corporate Defendants to work at a different pharmacy within the Corporate Defendants' network on short notice and for short periods of time.

32.     Defendant Bibi's son worked as a part-time regular employee at the Marhaba Pharmacy.

33.     The Individual Defendants also own APNA DayCare – a company that provides day care for elderly people. When the Individual Defendants need staff to cover shifts at the Corporate Defendants' various pharmacies, the Individual Defendants directed staff members

from APNA DayCare to cover these shifts. When the regular technicians at Marhaba Pharmacy were on vacation or took days off work, the Individual Defendants would direct staff from APNA DayCare to cover these shifts at the Marhaba Pharmacy.

34.     An individual named Mr. Usman worked as an office clerk and pharmacy technician for many of the Corporate Defendants' pharmacies.

35.     Mr. Usman recently stopped working for the Corporate Defendants. His farewell party, which was hosted by the Individual Defendants, was attended by many of the Corporate Defendants' employees who work at many of the Corporate Defendants' various pharmacies. At this party, Defendant Siddiqui and Defendant Bibi, and others, made speeches referencing Mr. Usman's work as an office clerk and describing how this work benefitted all of the Defendants' pharmacies within the network and that his contributions to the collective enterprise should be appreciated.

36.     The Individual Defendants operated the Corporate Defendants' payroll in an interconnected manner that reflects a single enterprise. For example, the Individual Defendants enacted a scheme to avoid paying overtime to the supervising pharmacists at various Corporate Defendants by scheduling many of them for 30-35 hours a week at one pharmacy, and then also scheduling them for an additional 10-20 hours a week at another pharmacy, for a total of 40-55 hours per week. The result would be that, according to the pay roll records for each Corporate Defendant individually, the supervising pharmacist did not work any overtime – but in reality, the supervising pharmacist would have worked over 40 hours per week for the integrated business enterprise and should have been entitled to overtime.

37.     This scheme is reflected in Plaintiff's interaction with Defendant Siddiqui. In April 2020, Plaintiff requested to Defendant Siddiqui via text message that Defendants pay him his normal hourly wage for the overtime hours he worked (Defendants paid

Plaintiff less than his hourly wage for every hour over 40 hours a week that he worked, as described below). In response, Defendant Siddiqui said that "The only way that you can get the same rate is that you work at a different pharmacy in the group," referring to the various Corporate Defendants, which the Individual Defendants' controlled.

38.     The Individual Defendants operated the Corporate Defendants as one enterprise, scheduling employees at the various pharmacies as their business needs dictated.

39.     The Corporate Defendants and Individual Defendants shared resources and operational structures in a manner that is indicative of a single enterprise.

40.     The Individual Defendants treated the pharmaceutical inventory at each Corporate Defendants' pharmacy as part of a single inventory of pharmaceuticals/medicine that could be sold at any other pharmacy, if the need arose.

41.     For example, often times if a customer ordered a prescription at one of the Corporate Defendants' pharmacies and that pharmacy did not have the medication in stock, the Individual Defendants would simply transfer the medication from one of the other Corporate Defendants' pharmacies that did have that medication in stock. These transfers occurred regularly and were not recorded.

42.     As another example, after an insurance company refused to work with some of the Corporate Defendants' pharmacies (including Marhaba Pharmacy) because the company uncovered unlawful double billing practices (detailed below), the Corporate Defendants would continue to fill prescriptions covered for customers covered by this insurance company by billing the prescription to one of the Defendants' other pharmacies but allowing the customer to pick up

the medication at the Corporate Defendants' pharmacies that were no longer covered by the insurance company. Specifically, the Individual Defendants, including Defendant Watto, instructed various staff members to charge Defendant Saul's Pharmacy and Defendant Healthy Ways pharmacy for prescriptions that were for Marhaba Pharmacy customers and that were filled at Marhaba Pharmacy.

43.    Relatedly, the Defendants had a practice of allowing customers to pick up medication at any of the Corporate Defendants' pharmacies regardless of which pharmacy the customer had submitted the initial prescription. As a result, customers were allowed to pick up medication from any of the Corporate Defendants' pharmacies based on a paper copy of the insurance label that was associated with any specific Corporate Defendant.

44.    In the fall of 2020, the Defendants' shut down a pharmacy known as "Healthways Pharmacy." The Defendants then distributed the remaining pharmaceutical inventory from "Healthways Pharmacy" to the various pharmacies run by the Corporate Defendants, including to Marhaba Pharmacy. Defendants soon thereafter opened Healthy Ways Pharmacy, located a few doors down from the old "Healthways Pharmacy" location. This is a further example of how the Defendants' pharmacies operated as a single entity.

45.    The Individual Defendants are also, themselves, family members and operate the Corporate Defendants as a family business enterprise.

46.    Defendant Watto is the brother of Defendant Bibi.

47.    Defendant Bibi and Defendant Watto's other brother – Asif Watto – is another co-owner and manager of many of the Corporate Defendants.

48.    The Individual Defendants employed various family members, including siblings, cousins, and nephews, to work at the various pharmacies owned by the Corporate Defendants.

49.    Overall, the Defendants treated all of the pharmacies in this network as a single

operation which shared medication, employees, and operations. In practice, there was no distinction between the Corporate Defendants' pharmacy operations.

50.     While Plaintiff worked at the Marhaba Pharmacy, because of the amount of control they exerted over his working conditions and because of the integrated nature of the Corporate Defendants' operations, all of the Corporate and Individual Defendants were Plaintiff's joint employers and are, collectively, a single integrated enterprise.

**Retaliation Facts**

51.     Plaintiff began working for Defendants as the Supervising Pharmacist at Marhaba Pharmacy in August 2018.

52.     As the Supervising Pharmacist, Plaintiff was entrusted to run the Marhaba Pharmacy, verify prescriptions, fill orders, and ensure compliance with state and federal regulations.

53.     By the end of 2018, Plaintiff began noticing that the technicians and staff at the Pharmacy were not always complying with the applicable rules and regulations governing patient privacy, substance control, recordkeeping, and billing.

54.     As a general matter, Plaintiff observed that Marhaba staff members did not follow the rules and regulations related to accurate record keeping.

55.     More specifically, Plaintiff noticed that the practices at Marhaba Pharmacy for record keeping related to billing insurance companies, including the federal and state funded Medicare and Medicaid programs, were irregular and opaque.

56.     As Plaintiff was not familiar with the type of prescription and billing software that Marhaba employed, Plaintiff asked the seasoned staff and technicians at the pharmacy to explain the software and billing irregularities.

57.     The staff and technicians pushed back on Plaintiff's request and was instructed to

keep out of the Pharmacy's business side and to stick to authorizing and verifying prescriptions. They further told Plaintiff that if he continued to press the issue, they would "report" him to the owner, Defendant Siddiqui.

58.     Plaintiff was shocked by this response. But because many of the technicians and staff were very close to the Defendants, Plaintiff reasonably believed he had no recourse and that the technicians were protected by the Defendants.

59.     Soon thereafter in late 2018 and early 2019, Plaintiff started to became aware of an irregular and unlawful relationship between the Pharmacy and a doctor (Dr. Abdul Wahid) in the community, whose patients routinely filled their prescriptions at the Pharmacy.

60.     Dr. Abdul Wahid is a general practitioner in the area, with a clinic at 8675 Bay Parkway, Brooklyn, NY 11214.

61.     The Pharmacy and Dr. Wahid had an unlawful arrangement, whereby Dr. Wahid's patients would come into the pharmacy and request medication without a prescription (i.e., without the doctor's prior approval). The Marhaba pharmacy technicians would fill these orders and sell drugs to Dr. Wahid's patients. Later, the technicians would notify Dr. Wahid of the sales and Dr. Wahid would write the prescriptions for the already sold medication and send them to the Pharmacy after the sale had taken place.

62.     Similarly, Marhaba pharmacy technicians would sell drugs to Dr. Wahid's patients who had expired prescriptions, and Dr. Wahid would similarly write up-dated prescriptions after the sales were final.

63.     Marhaba pharmacy technicians would also sell many months-worth of drugs to Dr. Wahid's patients, even when the prescriptions underlying the sales were only for a single month. Many patients would stock up on 6 months or more of drugs in preparation for traveling out of the country even though their prescription only allowed them a single month's worth of medicine.

64.     In this scenario, the pharmacy technicians would sell the patients as much of the medication as the patients wanted and would then contact Dr. Wahid to have him re-up the prescription for each subsequent month to account for the sales.

65.     Further, the technicians at the Pharmacy and Dr. Wahid would often communicate in ways that violated the Health Insurance Portability and Accountability Act ("HIPAA").

66.     Specifically, staff members at Dr. Wahid's office, including Dr. Wahid himself, and Pharmacy technicians would routinely transmit prescription and confidential patient information on their personal devices via text and What's App messages, in clear violation of HIPAA regulations, 45 C.F.R. Subpart E. During his entire employment with Defendants, Plaintiff never once spoke, or communicated directly, with Dr. Wahid, which was the normal, customary, and lawful way to transmit and verify prescriptions.

67.     Finally, Marhaba Pharmacy and Dr. Wahid engaged in outright insurance fraud by billing insurance companies for medicine that those patients never received. Marhaba technicians would instruct Dr. Wahid to issue prescriptions for patients who were living abroad, and the Pharmacy would bill insurance companies – including Medicare and Medicaid – for these drugs. This medicine was never provided to the patients, many of whom were likely unaware that prescriptions were being issued to them.

68.     The Pharmacy would resolve the disparities in their drug inventory by selling this medicine to other patients. In short, Defendants would double bill the insurance companies – once on a legitimate prescription where they would provide the medicine to a patient and once on a manufactured prescription from Dr. Wahid.

69.     Defendants often engaged in this unlawful double billing on expensive medications such as diabetic medications or on-brand drugs.

70.     This was textbook insurance fraud. Defendants billed insurance companies,

including Medicare and Medicaid, for medicine that was not provided to the patients.

71.     All of these practices violate various medical regulations including, but not limited to 42 C.F.R. Subpart B.

72.     Near the end of 2018 and into early 2019, Plaintiff slowly became aware of the above schemes and various operational and regulatory deficiencies.

73.     Plaintiff implored the technicians to stop these practices, but the technicians ignored Plaintiff and told him that they were acting at the direction of the Defendants.

74.     In fact, Defendant Siddiqui provided his password and log in credentials to the technicians at Marhaba and to Defendant Watto to allow them to alter data in the recordkeeping system.

75.     During this time Plaintiff contacted Defendant Siddiqui multiple times and complained about the unlawful practices with Dr. Wahid (along with the technician certification and record keeping issues), but Defendant Siddiqui largely ignored him and eventually told Plaintiff that business was the highest priority for the Pharmacy.

76.     Specifically, on April 28, 2019, Plaintiff texted Defendant Siddiqui and requested a face-to-face meeting with him so that Plaintiff could discuss his "serious concerns [about] filling prescriptions without prescriptions."

77.     Defendant Siddiqui ignored Plaintiff's requests for a face-to-face meeting and brushed aside Plaintiff's complaints.

78.     Throughout the summer and fall of 2019, Plaintiff routinely raised his concerns about the unlawful practices at Marhaba Pharmacy with the Individual Defendants, who disregarded his complaints and downplayed their seriousness and severity.

79.     At the end of 2019, Plaintiff again requested a face-to-face meeting with Defendant Siddiqui to discuss his complaints.

80.     Defendant Siddiqui delayed a face-to-face meeting with Plaintiff for many weeks.

81.     Plaintiff had requested to meet only with Defendant Siddiqui, and in February 2020, Defendant Siddiqui agreed. However, at the last minute, Defendant Siddiqui surprised Plaintiff by including Defendant Watto, the store manager of the Pharmacy, in the meeting.

82.     At this meeting, Plaintiff reiterated his specific complaints about the Pharmacy's practices related to Dr. Wahid (detailed above, along with the record keeping and HIPAA issues) and notified Defendant Siddiqui and Defendant Watto that these practices were unlawful and needed to stop immediately.

83.     Plaintiff made clear that the situation with Dr. Wahid was very serious and that allowing it to continue would put the Pharmacy in legal jeopardy.

84.     In response, Defendant Siddiqui brushed off the seriousness of the issues that Plaintiff raised, and suggested that the viability of the Pharmacy's business depended on engaging in these unlawful practices.

85.     Defendant Siddiqui told Plaintiff that this arrangement was good for "business" and that without "good business" there would be no job for Plaintiff at the Pharmacy.

86.     This was a clear threat to Plaintiff's job – if Plaintiff disrupted the various unlawful schemes that the Pharmacy was running with Dr. Wahid, Plaintiff would be fired.

87.     Plaintiff also raised complaints about the need of Pharmacy technicians to follow recordkeeping, HIPAA, and other pharmaceutical regulations and to cooperate with Plaintiff's leadership and guidance.

88.     Defendant Siddiqui and Defendant Watto completely ignored these complaints.

89.     After this meeting, Plaintiff continued to instruct the Pharmacy technicians to abide by the appropriate regulations. The Pharmacy technicians largely ignored Plaintiff's requests.

90.     Nevertheless, going forward, Plaintiff pushed the staff at the Pharmacy to implement best practices for compliance and record keeping operations.

91.     In retaliation for Plaintiff's complaints, Defendant Siddiqui interfered with Plaintiff's ability to execute his job duties as the Supervising Pharmacist by limiting Plaintiff's ability to access and alter data in the Pharmacy's recordkeeping system. Specifically, Defendant Siddiqui limited Plaintiff's ability to access information regarding the movement of medical inventory and blocked his ability to reverse or alter high dollar billings, which was the bulk of the fraudulent billing.

92.     Near the end of 2019 and in the beginning of 2020, Plaintiff began to consider reporting these issues to the authorities.

93.     Then, in the spring of 2020, the Covid-19 pandemic hit New York City.

94.     However, throughout the pandemic, the unlawful schemes between the Marhaba Pharmacy and Dr. Wahid continued.

95.     In July 2020 the United States Drug and Enforcement Agency ("DEA") inspected the Marhaba Pharmacy to check if Marhaba was in compliance with its opioid regulations. Thanks to Plaintiff's implementation of record keeping practices, the Pharmacy passed its DEA inspection, which was only focused on specific highly addictive medications.

96.     Nevertheless, because Plaintiff had already complained about Defendants' unlawful behavior, Defendants accused Plaintiff of reporting the Pharmacy to the DEA. However, this was untrue, Plaintiff did not report the Pharmacy to the DEA.

97.     In the summer of 2020, the private insurer United Health Insurance ("United"), cancelled its contract with Marhaba Pharmacy. United cancelled its contract as a result of an audit of Defendants' billing practices in which United concluded that Defendants had been billing

United for medicine that was never distributed to customers. This was one of the exact issues that Plaintiff had previously complained to Defendants about. As a result of these findings, United ended its business relationship with Marhaba Pharmacy.

98.     Defendants, in an attempt to get around United's refusal to work with Marhaba, created a scheme by which Marhaba would still fill prescriptions for any patient with United, but would credit the payments to a different pharmacy, one that the Individual Defendants owned.

99.     The outcome was that on paper patients with United Insurance were no longer getting their medications from Marhaba, they were getting their medications from a different pharmacy. In reality these patients were obtaining drugs from Marhaba Pharmacy, but the billing was going through a different pharmacy owned by Defendant Siddiqui.

100.    During the summer of 2020, Defendants decided to renovate the Pharmacy. After completing the renovation, Defendants were required to have the space inspected by state regulators before being allowed to operate in the new space.

101.    Defendants ignored these requirements and unlawfully began operating in the newly renovated space without first getting the required approvals. Plaintiff complained to Defendant Siddiqui about this violation.

102.    Through the end of 2020 and into 2021, Marhaba Pharmacy continued its illegal billing practices and continued to defraud both private and public insurers – including Medicaid and Medicare – by charging insurance companies for drug sales that were never provided to any patients.

103.    Throughout this time, Plaintiff kept imploring the technicians at the Pharmacy to comply with the pharmaceutical regulations.

104.    To that end, Plaintiff had begun setting up verification systems when he was working to ensure that all medications that were sold during his shift had the proper prescriptions

15

and were actually given to customers.

105.    Shortly after instituting these systems, Plaintiff learned that Defendant Watto and the Pharmacy technicians, including Ms. Huma, were circumventing the sales verification process by altering data at the point of sale. They would alter the dates on the sale and sign for patients themselves, including for patients who never picked up (i.e., received) their medicine. When Plaintiff discovered various discrepancies in the system, he questioned Ms. Huma and Defendant Watto about them. They ignored the issue and refused to alter their behavior.

106.    During this time period, Defendant Siddiqui and the Pharmacy technicians began filling prescriptions for Cytotec (an ulcer medicine), a medicine with a black box warning for pregnant women because of the potential side effect that could cause an in-utero child to be born with severe and permanent defects. In order to prescribe this medication, Doctors are required to provide extensive warnings to patients about the risk of these side effects and pharmacists are required to verify that these warnings were given before distributing the medication.

107.    Whenever Plaintiff was asked to authorize a prescription for Cytotec (or an off-brand substitute) he would seek to call the doctor issuing the prescription as he was required to do to verify that the required warnings were given and that the medicine was prescribed for the appropriate and lawful reasons. Some doctors would mistakenly forget to give the patient the appropriate warnings, while other doctors were known to prescribe this medicine for abortions, which is not approved by the FDA. The verification process is a way to ensure the medicine is being prescribed properly.

108.    However, Defendants and the Pharmacy Technicians prevented Plaintiff from calling the prescribing to doctors and verifying these prescriptions because Defendants wanted to fill the prescription and calling the doctors could jeopardize the sale of the medicine. As a result, Plaintiff refused to sign off on filling these prescriptions. The Pharmacy Technicians would fill

the prescriptions themselves and told Plaintiff that Defendant Siddiqui would come in later himself to verify these prescriptions, which Defendant Siddiqui did not do.

109.     Plaintiff again complained to Defendant Siddiqui. On April 11, 2021, Plaintiff sent an email to Defendant Siddiqui complaining about the unlawful and ethical practices that were occurring at the pharmacy described above.

110.     The April 11, 2021 email was the first highly detailed and written complaint that Plaintiff submitted to Defendants that outline the various unlawful practices at Marhaba Pharmacy.

111.     Among the other things detailed above, Plaintiff complained specifically about the unlawful billing practices at the pharmacy, which resulted in Defendants overbilling the Medicare and Medicaid programs.

112.     By way of example, Plaintiff described a fraudulent billing scheme were Ms. Humaria and Ms. Huma were charging Medicaid for large orders of the medication Famotidine, even though Plaintiff had not signed off on the orders or seen the prescriptions (via the verification process).

113.     Plaintiff had become aware of the overbilling because the Famotidine boxes were stacking up at the Pharmacy and were clearly not given to any customers. When Plaintiff reviewed the records, it showed that technicians had been re-filling old prescriptions (via Dr. Wahid) without providing the medication to the customers. Plaintiff had questioned the technicians on the overbilling but they could not provide any coherent justification.

114.     This scheme violates, among other laws, 42 C.F.R. Subpart B.

115.     In the April 11, 2021 email, Plaintiff complained about Defendants unlawful behavior, which posed a substantial and specific danger to public health and safety and violated various state and federal laws including, but not limited to, New York Public Health Law, Article 33, and 10 N.Y.C.R.R. Part 80.

116.      In response to Plaintiff's detailed and written complaints, Defendant Siddiqui lied and wrote in an email to Plaintiff that "[t]his is the first time that you have informed me" of these issues, and put the blame on Plaintiff for any irregularities or unlawful behavior.

117.      In fact, Plaintiff had been raising the issue with Defendants consistently since late 2018 when he became aware of the issues at the Pharmacy, and Plaintiff had been attempting to institute reforms at the Pharmacy throughout his tenure but was refused at every turn by technicians who received their orders directly from Defendants.

118.      Defendants waited two months before firing Plaintiff in retaliation for making these complaints.

119.      On or around June 26, 2021, Defendant Siddiqui fired Plaintiff.

120.      When Plaintiff asked Defendant Siddiqui why he was being fired, Defendant Siddiqui provided a non-response. Defendant Siddiqui told Plaintiff that he was being fired for "business reasons" and vaguely alluded to a "re-structuring" of the pharmacy business.

121.      Defendant Siddiqui's stated reason was pre-textual, there was no *legitimate* business reason to fire Plaintiff. Plaintiff was an excellent employee and never received a complaint about his work performance and Defendants' businesses were not re-structured or altered in any substantial way after Plaintiff's termination.

122.      However, Defendants did have an illegitimate "business reason" for firing Plaintiff. As Defendant Siddiqui explained to Plaintiff previously, without the unlawful schemes, Defendants would have "no business." By attempting to stop Defendants from defrauding the government and violating the various healthcare regulations, Plaintiff threatened Defendants' bottom line. Defendants got rid of Plaintiff to prevent him from interfering with their illegal schemes.

123.      Defendants fired Plaintiff in retaliation for complaining about Defendants'

litany of unlawful practices, including Medicare and Medicaid fraud.

### **Wage and Hour Facts**

124.     Plaintiff worked for Defendants as an hourly, non-exempt employee.

125.     Defendants were Plaintiff's employer.

126.     Defendant Siddiqui hired Plaintiff, set Plaintiff's rate of pay, and fired Plaintiff.

127.     Defendant Watto was Plaintiff's employer.

128.     Defendant Watto had the co-authority, along with Defendants' Bibi and Siddiqui, to hire and fire employees, including Plaintiff and to change Plaintiff's rate of pay. Defendant Watto attended corporate meetings with Defendant Bibi and Defendant Siddiqui at the central office on Neptune Avenue. Defendant Watto announced various policy decisions that were created during these corporate meetings and that effected all the employees at Marhaba Pharmacy and the operations at Marhaba Pharmacy.

129.     Defendant Watto managed Marhaba Pharmacy. Defendant Watto was Plaintiff's direct supervisor and controlled the day-to-day working conditions of Plaintiff's employment.

130.     Defendant Watto set Plaintiff's work schedule.

131.     Defendant Watto had the authority to send employees of the Marhaba Pharmacy home early, and Defendant Watto exercised this authority by sending Plaintiff home early on a few occasions.

132.     Defendant Watto had the authority to write checks on behalf of Marhaba Pharmacy and regularly wrote and issued the check for Plaintiff's overtime hours.

133.     Defendant Watto managed the Marhaba Pharmacy's day-to-day operations, and provided instructions and directions to the pharmacy staff, including directions to violate HIPAA and other regulations, as described above.

134.     Defendant Watto had the responsibility and authority over the medicinal inventory at the Marhaba Pharmacy, including the power to order medicine and medical supplies.

135.     Defendant Watto attended important meetings regarding Plaintiff's employment, including the meeting where Plaintiff complained directly to Defendant Siddiqui and Defendant Watto regarding the Defendants' unlawful billing practices, described above.

136.     Defendant Bibi was Plaintiff's employer and is a co-owner of the Corporate Defendants, including the Marhaba Pharmacy.

137.     Defendant Bibi had the authority to hire and fire employees, including Plaintiff. Defendant Bibi had the authority to write checks on behalf of Marhaba Pharmacy.

138.     From August 2018 to approximately the fall of 2020, Defendants paid Plaintiff an hourly rate of $58.00.

139.     From approximately the fall of 2020 through his termination on June 26, 2021, Defendants paid Plaintiff an hourly rate of $60.00 per hour.

140.     During the entirety of Plaintiff's employment, Plaintiff routinely worked approximately five days a week, for nine hours each day, from 11AM to 8PM-8:30PM. Thus, Plaintiff routinely worked at least approximately 45 hours per week and often more.

141.     However, Defendants failed to pay Plaintiff one and a half times his regular rate for all the overtime hours he worked.

142.     Specifically, during the period when Defendants paid Plaintiff an hourly rate of $58.00 per hour (August 2018-fall of 2020), when Plaintiff worked over 40 hours in a week, Defendants would pay Plaintiff $40.00 per hour for each hour that he worked over forty hours that week. This was *less than* his regular rate of pay.

143.     Then, during the period when Defendants paid Plaintiff an hourly rate of

$60.00 per hour (fall of 2020-June 26, 2021), when Plaintiff worked over 40 hours in a week, Defendants would pay Plaintiff $45.00 per hour for each hour that he worked over forty hours that week. Again, this was *less than* his regular rate of pay.

144.     Defendants did not provide Plaintiff with written notice of his pay rate, as required by N.Y. Lab. L. § 195(1).

### FIRST CLAIM FOR RELIEF
### (False Claims Act Retaliation – 31 U.S.C. § 3730)

145.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

146.     The Corporate Defendants retaliated against Plaintiff for engaging in protected activityunder the False Claims Act.

147.     As a result of the Corporate Defendants' unlawful conduct, Plaintiff is entitled double his lost wages, interest, compensatory damages, special damages, attorneys' fees and costs, and suchother legal and equitable relief as this Court deems just and proper.

### SECOND CLAIM FOR RELIEF
### (New York False Claims Act Retaliation – N.Y. State Fin. Law § 191)

148.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

149.     The Corporate Defendants retaliated against Plaintiff for engaging in protected activity under the New York False Claims Act.

150.     As a result of the Corporate Defendants' unlawful conduct, Plaintiff is entitled double his lost wages, interest, compensatory damages, special damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### (New York Labor Law § 740 – Retaliation)

151.     Plaintiff realleges and incorporates by reference all preceding paragraphs

as if they were set forth again herein.

152.     In violation of Section 740 of the New York Labor Law, Defendants intentionally and willfully retaliated against Plaintiff by terminating his employment because he complained about, and took actions to redress, issues that were causing violations of law, including but not limited to New York Public Health Law, Article 33, and 10 N.Y.C.R.R. Part 80, and creating a substantial and specific danger to the public health or safety.

153.     Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

154.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including benefits, past salary, and lost wages.

155.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages, back pay, lost benefits, restitution, emotional distress damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

### **FOURTH CLAIM FOR RELIEF**
**(FLSA Overtime Violations, 29 U.S.C. §§ 201 *et seq.*)**

156.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

157.     Plaintiff routinely worked in excess of forty (40) hours per workweek.

158.     Defendants failed to pay him one and a half times his regular hourly rate for all overtime hours worked, and they failed to keep records required by the FLSA and relevant regulations, even though Plaintiff was entitled to overtime.

159.     Plaintiff seeks damages in the amount of his unpaid overtime compensation, liquidated (double) damages as provided by the FLSA for overtime violations, attorneys' fees and

costs, and such other legal and equitable relief as this Court deems just and proper.

### FIFTH CLAIM FOR RELIEF
### (New York State Overtime Violations,
### N.Y. Comp. Codes R. & Regs. tit. 12, §§ 142-2.2, 143-3.2)

160.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

161.     It is unlawful under New York law for an employer to suffer or permit a non-exempt employee to work without paying overtime wages for all hours worked in excess of forty (40) hours in any workweek.

162.     Defendants willfully, regularly, and repeatedly failed to pay Plaintiff at the required overtime rate of one-and-one-half times his regular rate for hours worked in excess of forty (40) hours per workweek.

163.     As a result of Defendants' willful and unlawful conduct, Plaintiff is entitled to an award of damages, including liquidated damages, in amount to be determined at trial, pre- and post-judgment interest, and attorneys' fees and costs.

### SIXTH CLAIM FOR RELIEF
### (New York Notice Requirements, N.Y. Lab. L. §§ 195, 198)

164.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

165.     Defendants did not provide Plaintiff with a written wage notice or adequate wage statements as required by N.Y. Lab. Law § 195(1), (3).

166.     As a result of Defendants' unlawful conduct, Plaintiff is entitled to an award of damages, including liquidated damages, in amount to be determined at trial, pre- and post-judgment interest, and attorneys' fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.      An award of damages, according to proof, including, back pay, front pay, compensatory damages, liquidated damages, emotional distress damages, and punitive damages, to be paid by Defendants;

B.      Costs of action incurred herein, including expert fees;

C.      Attorneys' fees, including fees pursuant to 29 U.S.C. § 216, N.Y.C. Admin. Code § 8-502, N.Y. Lab. L. §§ 198, 663 and other applicable statutes;

D.      Pre-judgment and post-judgment interest, as provided by law; and

E.      Such other and further legal and equitable relief as this Court deems necessary, just and proper.

Dated:  New York, New York
February 4, 2022

Respectfully submitted,

JOSEPH & KIRSCHENBAUM LLP

By:
/s/ Michael DiGiulio

Michael DiGiulio
D.Maimon Kirschenbaum
32 Broadway, Suite 601
New York, NY 10004
Tel: (212) 688-5640
Fax: (212) 981-9587

*Attorneys for Plaintiff*

**DEMAND FOR A JURY**

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which he has a right to jury trial.